**PANAMERICAN MINERAL SERVICES, INC., a Wyoming corporation, Appellant (Plaintiff),**

v.

**KLS ENVIRO RESOURCES, INC., a Nevada Corporation; And Dateline Internacional, S.A. de C.V., a Mexican National corporation, Appellees (Defendants).**

No. 95–166.

Supreme Court of Wyoming.

May 17, 1996.

Richard E. Day of Williams, Porter, Day & Neville, P.C., Casper, for Appellant.

Patrick Dixon of Dixon & Despain, Casper, for Appellants.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR and LEHMAN, JJ.

THOMAS, Justice.

The question posed is whether a Wyoming court can exercise personal jurisdiction over a parent corporation, KLS Enviro Resources, Inc. (KLS), and its sister corporation, Dateline Internacional, S.A. de C.V. (DIMSA), neither of which has the requisite minimum contacts with Wyoming, if a subsidiary corporation, Dateline Drilling, Inc. (Dateline), which has the requisite minimum contacts, is an alter ego of the parent or the sister. The district court had personal jurisdiction over Dateline, but ruled it lacked personal jurisdiction over KLS and DIMSA and dismissed the complaint against them filed by PanAmerican Mineral Services, Inc. (PanAmerican) to enforce arbitration. We hold that piercing the corporate veil between KLS and Dateline and Dateline and DIMSA affords personal jurisdiction over KLS and DIMSA as alter egos of Dateline. The order of the district court dismissing the case against KLS and DIMSA is reversed, and the case is remanded for further proceedings in accordance with this opinion.

In the Brief of Appellant PanAmerican Mineral Services, Inc., the issues are stated to be:

The issues before this Court are whether under the facts presented herein the Defendants KLS Enviro Resources, Inc., a Nevada Corporation and Dateline Internacional, S.A. de C.V., a Mexican National Corporation and subsidiary of KLS Enviro Resources, Inc., are, by their actions, subject to In Personam jurisdiction in the State of Wyoming by virtue of an "Agreement" between Appellant PanAmerican Mineral Services, Inc., a Wyoming Corporation, and Dateline Drilling, Inc., a Montana Corporation, wholly-owned subsidiary of KLS Enviro Resources, Inc. and sister

corporation to Dateline Internacional S.A. de C.V.

In the Brief of Appellees KLS Enviro Resources, Inc. and Dateline Internacional, S.A. de C.V., the issues are stated to be:

> While Appellees do not quarrel with PanAmerican's statement of the issues, a more precise statement of the issue would be as follows:

> May this Court exercise vicarious personal jurisdiction over the non-resident corporate Defendants?

PanAmerican and Dateline contracted with respect to mineral drilling in Mexico. The agreement was made on March 20, 1991 and amended on August 16, 1991. It provided, for the five-year term of the agreement, that if PanAmerican wished to bid on a drilling project in Mexico or Central America, PanAmerican was to give Dateline all pertinent information in order for Dateline to bid the project. With respect to any drilling project in either country, if Dateline decided to bid, it would submit the completed bid to PanAmerican. PanAmerican then would pass the bid along to a potential Mexican or Central American client. Upon acceptance by the client of the Dateline bid, PanAmerican agreed to provide consulting services to Dateline and "assistance with border crossing, customs clearance, and transportation of Dateline's rigs and equipment within Mexico or Central America to the job site." The purpose of the agreement was to provide that all drilling operations performed by Dateline in either Mexico or Central America would be accomplished through, and in the name of, PanAmerican or its foreign subsidiary.

The agreement provided that any disputes between the parties regarding interpretation of its provisions were to be resolved by a "mutually agreeable arbitration procedure." PanAmerican and Dateline specifically provided for the contract to be binding on their respective successors, assigns, subsidiaries, and other entities owned or controlled by either of them. The contract invoked the law of Wyoming providing that the "agreement shall be construed as to validity, interpretation and effect according to the laws and court decisions in Wyoming." It was executed in Casper, and the amendment was sent to Dateline's Montana office on letterhead from PanAmerican's corporate office in Casper.

PanAmerican and Dateline conducted business in Mexico through June 1993, utilizing PanAmerican's Mexican subsidiary, Servicios Mineros PanAmericanos S.A. de C.V. Both PanAmerican and Dateline received remuneration for their services according to the contract during this period of time. In August 1992, Dateline's representative telephoned PanAmerican's Casper office and informed PanAmerican's president that Dateline, in conjunction with KLS, wished to buy out the agreement from PanAmerican. PanAmerican presented an offer to KLS/Dateline, but it was refused. Subsequently, PanAmerican rejected a counteroffer to buy out the contract for $50,000.

KLS then sent a letter, dated February 17, 1993, from Montana to PanAmerican in Wyoming. The letter advised PanAmerican's president that Dateline had been acquired by KLS and no longer would perform drilling operations in Mexico or Central America. The letter was signed by the vice-president of KLS, who previously had been Dateline's representative in the failed buy-out negotiations with PanAmerican. On February 19, 1993, PanAmerican replied in a letter from its president, expressing concern over PanAmerican's and Dateline's mutual drilling commitment in Sonora, Mexico. That letter advised KLS that the original agreement bound the successors and affiliated entities of Dateline for five years, until March 20, 1996. In a response dated February 25, 1993, KLS advised PanAmerican that KLS "may very well engage in core drilling in Mexico, Central America and elsewhere, and need not account to PanAmerican nor does it need its approval."

A meeting was held in Missoula, Montana, on March 6, 1993, in an attempt by KLS and PanAmerican to iron out differences. Neither KLS nor Dateline wanted to continue under the terms of the agreement, so proposed amendments were drafted. The parties did agree to operate under the existing agreement until the amendments were executed. Drilling activity in Mexico proceeded even though the amendments never were

incorporated into the agreement, and Dateline submitted invoices for work completed in June 1993. The business arrangement was interrupted by a letter, dated June 7, 1993, from Dateline's attorney in Dallas in which he demanded remittance for funds PanAmerican had been withholding to pay its Mexican tax liability. Subsequently, on August 6, 1993, Dateline's Wyoming attorney sent a letter to PanAmerican in Casper demanding arbitration of their differences pursuant to the agreement.

So far as this record discloses, PanAmerican received no further payment under the terms of the agreement after June 1993. The record reflects, however, that DIMSA continued to drill in Mexico, but made no accounting to PanAmerican as the "successor and assign" of Dateline. Documentation presented by PanAmerican further shows that KLS acquired Dateline by trading 48% of KLS stock to Dateline's sole shareholder. In return, Dateline's sole shareholder turned over all Dateline stock to KLS and became a director, officer, and shareholder of KLS. Consequently, PanAmerican alleges in its complaint that KLS utilized its wholly-owned subsidiary, DIMSA, to accomplish the business in Mexico and Central America that previously had been accomplished through PanAmerican's Mexican subsidiary.

The pre-incorporation agreement of KLS is part of the record. In that agreement, the following language appears:

> *Foreign Operations.* Assuming the proposed acquisition of Dateline is consummated, the Company, **through Dateline,** will be engaged in operations in Mexico. (Emphasis added.)

A few pages further on, the agreement states:

> Assuming the capitalization of Dateline (via the Company [KLS]) occurs as expected * * * Dateline expects to move at least four additional rigs to Mexico and to drill approximately 275,000 feet by September 30, 1993.

Another document in the record is a report that KLS filed with the Securities and Exchange Commission on February 18, 1994. This document summarizes KLS's accounting policies and significantly states:

2. *Principles of Consolidation*

> The accompanying unaudited consolidated financial statements contain the accounts of K.L.S. Enviro Resources, Inc., Dateline Drilling, Inc., K.L.S. Co., Inc., K.L.S. Environmental, Inc. and Dateline Internacional, S.A. de C.V. All significant intercompany transactions and balances have been eliminated in consolidation. **The consolidated group is referred to as the "Company".** (Emphasis added.)

Other documents in the record show drilling logs printed on a Dateline Drilling, Inc. form, reflecting operations performed after July 1993, and some of these logs indicate DIMSA was using Dateline rigs to drill in Mexico.

The arbitration board issued a decision letter on July 12, 1994, in which it found "all reasonable factual inferences must be made in favor of PanAmerican" and went on to hold both KLS and DIMSA were bound by the terms of the agreement relating to Mexico and Central America under Wyoming law. This determination was based upon the "legal relationship, stock ownership, officers and business plans of Dateline and KLS, and the use of Dateline's equipment to accomplish DIMSA's work." The board agreed that KLS and DIMSA should be joined in the arbitration, but neither corporation responded to attempts to compel arbitration in Wyoming.

On November 18, 1994, PanAmerican filed a complaint against KLS and DIMSA in the district court. PanAmerican asserted that KLS is the alter ego of DIMSA; KLS and DIMSA are the successors or assigns of Dateline; the agreement is binding on KLS and DIMSA; KLS and DIMSA have unlawfully refused to arbitrate; and KLS, through DISMA, is attempting to circumvent the terms of the agreement. When KLS and DIMSA filed an answer on January 18, 1995, the affirmative defenses of lack of personal jurisdiction, failure to state a claim, and estoppel were presented. On February 28, 1995, KLS and DIMSA filed their motion to dismiss based upon PanAmerican's failure to state a claim under Wyo.R.Civ.P. 12(b)(6). After a response brief was filed by PanAmer-

ican on April 3, 1995, the district court authored its decision letter on April 18, 1995, and the order of dismissal was filed on May 22, 1995.

Previously, we have ruled that federal authority interpreting FED.R.CIV.P. 12 is highly persuasive because of the virtual identity of the two rules. *Kimbley v. City of Green River*, 642 P.2d 443 (Wyo.1982). In the federal courts, the practice is to consider affidavits and any other relevant matter that may assist the court in determining jurisdictional facts when confronted with a motion to dismiss under Rule 12(b)(2). *E.g., Mylan Labs, Inc. v. Akzo, N.V.*, 2 F.3d 56 (4th Cir.1993); *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76 (2d Cir.1993); *Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell, Partnership v. Medfit Int'l, Inc.*, 982 F.2d 686 (1st Cir. 1993); *Theunissen v. Matthews*, 935 F.2d 1454 (6th Cir.1991); *Patterson by Patterson v. F.B.I.*, 893 F.2d 595 (3d Cir.1990); *Nelson by Carson v. Park Indus., Inc.*, 717 F.2d 1120 (7th Cir.1983), *cert. denied sub nom., Bunnan Tong & Co., Ltd. v. F.W. Woolworth Co.*, 465 U.S. 1024, 104 S.Ct. 1277, 79 L.Ed.2d 682 (1984) and *cert. denied sub nom., United Garment Mfg. Co., Ltd. v. Nelson by Carson*, 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984); *Simon v. United States*, 644 F.2d 490 (5th Cir.1981); *Data Disc, Inc. v. Sys. Technology Associates, Inc.*, 557 F.2d 1280 (9th Cir.1977). This practice is summarized in CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE CIVIL 2D § 1351, at 253 (1990):

> When a court is considering a challenge to its jurisdiction over defendant or over a res, it may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts;
> * * *.

In making its decision on the issue, the trial court has considerable leeway. It may determine the matter on the basis of pleadings and other materials called to its attention; it may require discovery; and it may even conduct an evidentiary hearing. In an instance such as this, in which no evidentiary hearing was conducted, the only burden on PanAmerican was to make a *prima facie* showing of jurisdiction. These features of the disposition of the issue of personal jurisdiction are summarized in *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981):

> In deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable leeway. It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion. If the court chooses not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials. Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial. But until such a hearing is held, a prima facie showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion. (Citations omitted.)

*See also* Mylan Labs, Inc.; *Gould v. P.T. Krakatau Steel*, 957 F.2d 573 (8th Cir.1992), *cert. denied*, 506 U.S. 908, 113 S.Ct. 304, 121 L.Ed.2d 227 (1992); *Market/Media Research, Inc. v. Union Tribune Publishing Co.*, 951 F.2d 102 (6th Cir.1991), *cert. denied*, 506 U.S. 824, 113 S.Ct. 79, 121 L.Ed.2d 43 (1992); *Ball v. Metallurgie Hoboken–Overpelt S.A.*, 902 F.2d 194 (2d Cir.1990), *cert. denied*, 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990); *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361 (2d Cir.1986); *Fields v. Sedgwick Associated Risks, Ltd.*, 796 F.2d 299 (9th Cir.1986); *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117 (2d Cir.1984); *Forsythe v. Overmyer*, 576 F.2d 779 (9th Cir.1978) *cert. denied*, 439 U.S. 864, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978).

In the decision letter included in the court file, the district court stated:

> Plaintiff [PanAmerican] apparently argues that the maker of the contract, Dateline, could be held personally responsible in Wyoming, that the Defendants have taken control of Dateline, and that the Defendants, therefore, can be held liable in Wyo-

ming. The problem is that there is no legal authority cited to support this theory. Plaintiff cites many cases to the effect that the successor corporation is liable for contracts of the original company. However, liability is not the issue here. The question is whether Defendants [KLS and DIMSA] can be held to answer in this State for their liability, if any.

We agree that liability is not the issue. The question is whether, under the doctrine of piercing the corporate veil, the parent and sister corporations can be brought into Wyoming as alter egos of Dateline, over which the district court clearly had jurisdiction.

We have structured some definitive criteria with respect to the doctrine of piercing the corporate veil. In *Amfac Mechanical Supply Co. v. Federer*, 645 P.2d 73, 79 (Wyo. 1982), we said:

> For a corporation to be accorded treatment as a separate entity, it must exist and function as such and not be the alter ego of the person [or corporation] owning and controlling it and cannot be used or ignored just to fit the convenience of the individual [or corporation].

In *Federer*, we identified, by quoting with approval from *Arnold v. Browne*, 27 Cal. App.3d 386, 103 Cal.Rptr. 775, 781–82 (1972), certain factors that justify disregarding the corporate entity or piercing the corporate veil:

> Among the possible factors pertinent to the trial court's determination are: commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses; the treatment by an individual of the assets of the corporation as his own; the failure to obtain authority to issue or subscribe to stock; the holding out by an individual that he is personally liable for the debts of the corporation; the failure to maintain minutes or adequate corporate records and the confusion of the records of the separate entities; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and

officers of the two entities in the responsible supervision and management; the failure to adequately capitalize a corporation; the absence of corporate assets, and under capitalization; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest or concealment of personal business activities; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; the use of the corporate entity to procure labor, services or merchandise for another person or entity; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another; the contracting with another with intent to avoid performance by use of a corporation as a subterfuge of illegal transactions; and the formation and use of a corporation to transfer to it the existing liability of another person or entity [citation].

*Federer*, 645 P.2d at 77–78.

*See also Kloefkorn–Ballard Constr. and Dev., Inc. v. North Big Horn Hosp. Dist.*, 683 P.2d 656, 661 (Wyo.1984); *Miles v. CEC Homes, Inc.*, 753 P.2d 1021, 1024 (Wyo.1988). We also noted that a showing of actual fraud, by itself, may be sufficient for piercing the corporate veil. *Federer*, 645 P.2d at 79.

In our judgment, the Supreme Court of California has appropriately addressed the proposition of personal jurisdiction where the subsidiary is an alter ego of the parent or when the corporate veil appropriately may be pierced. It has held that, if the alter ego situation is present, then the jurisdictional presence of the subsidiary can result in personal jurisdiction over a parent, and we are clear, a sister corporation. *Westinghouse Elec. Corp. v. Superior Court of Alameda County*, 17 Cal.3d 259, 131 Cal.Rptr. 231, 551 P.2d 847 (1976); *Empire Steel Corp. of Texas, Inc. v. Superior Court of Los Angeles County*, 56 Cal.2d 823, 17 Cal.Rptr. 150, 366

P.2d 502 (1961). While such authority may not have been cited to the trial court, it does exist.

PanAmerican alleges in its complaint that KLS is the alter ego of DIMSA. The supporting documentation filed with the complaint shows DIMSA continued drilling activities in Mexico using Dateline equipment, but without paying PanAmerican under the terms of the contract. All Dateline stock was transferred to KLS, and Dateline's sole shareholder became an officer of KLS; in its pre-incorporation agreement, KLS stated it would be engaging in drilling operations in Mexico "through Dateline," and that Dateline now was a prong of KLS Consolidated Group referred to as the "Company." The information gleaned from PanAmerican's supporting documentation establishes at least as a *prima facie* matter that KLS used DIMSA as a "mere shell, instrumentality or conduit" to avoid Dateline's obligations under the contract with PanAmerican. The record is sufficient to establish a *prima facie* case that KLS and DIMSA are "alter egos" of Dateline. *Federer.*

There can be no question that Dateline is subject to personal jurisdiction in Wyoming. It clearly had sufficient minimum contacts such that it would have reasonably anticipated being sued in this jurisdiction. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490, 501 (1980), and those cases that have followed this precedent. By acting as surrogates of Dateline in continuing the drilling operation, KLS and DIMSA also became subject to suit in Wyoming. The corporate actions of Dateline became the actions of the parent and the sister corporation, and the converse also is true. The district court had jurisdiction over Dateline, and it had jurisdiction over KLS and DIMSA. A *prima facie* case was established to invoke the personal jurisdiction of the Wyoming court. Under the circumstances, the motion to dismiss should not have been granted. It may be, at an evidentiary hearing, PanAmerican will be unable to establish proof of personal jurisdiction by a preponderance of the evidence. However, we are satisfied as a matter of law, this record shows a *prima facie* case that both KLS and DIMSA are the alter egos of Dateline and subject to the same jurisdiction in a Wyoming court as Dateline.

The order of dismissal is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.